USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/26/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                :

MTS LOGISTICS, INC.,                    :

                                :                19 Civ. 4216 (PAE)

                    Plaintiff,        :

                                :                OPINION & ORDER

              -v-                  :

                                :

INNOVATIVE COMMODITIES GROUP, LLC,  :

                                :

                    Defendant.   :

                                :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff MTS Logistics, Inc. ("MTS"), brings this action against defendant Innovative

Commodities Group, LLC ("Innovative"), for damages MTS allegedly incurred in connection

with the overseas shipping of plastic scrap on behalf of Innovative. MTS alleges that Innovative

has breached MTS's bill of lading, bringing the case within the Court's admiralty jurisdiction.

As to personal jurisdiction over Innovative, MTS relies on a forum selection clause in the bill of

lading. Before the Court is Innovative's motion to dismiss for lack of personal jurisdiction under

Federal Rule of Civil Procedure 12(b)(2). For the following reasons, the Court grants that

motion.

# I.    Background

## A.    Factual Background[1]

### 1.    The Parties

MTS is a New York transportation corporation with its principal place of business in New York. Compl. ¶¶ 3–4. Specifically, it is a non-vessel operating common carrier ("NVOCC") that provides cargo haulage and other import and export services. *Id.* NVOCCs contract with merchants or cargo owners who want to ship their goods, agreeing to transport those goods overseas via ship, and generally issuing that merchant a bill of lading that governs the voyage. *See id.* ¶ 3 n.2. The NVOCC, however, does not own or operate the ship that will transport such goods. *Id.*; *see also* 46 U.S.C. § 40102(17)(A). Instead, the NVOCC purchases space on the ship of an ocean common carrier—who physically transports the goods—and the carrier then issues the NVOCC its own bill of lading when the goods are loaded onto the ship.

---

[1] The Court's account of the factual allegations is drawn from the Complaint. Dkt. 1 ("Compl."). On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials. *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)). The allegations in the complaint are presumed true "to the extent they are uncontroverted by the defendant's affidavits," *MacDermid*, 702 F.3d at 727 (citation omitted), and all factual disputes are resolved in the plaintiff's favor, *see DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (citation omitted). Accordingly, in connection with Innovative's motion to dismiss, the Court has considered the affidavit of Julia Salazar, Esq., in support of the motion, Dkt. 17 ("Salazar Decl."). MTS has attached exhibits to its unsworn memorandum of law. Dkt. 19 ("Pl. Mem."). Because these documents are not attached to a sworn affidavit, and thus not authenticated, the Court is at liberty not to consider them. *Cf. Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (a "memorandum of law . . . is not evidence at all"); *Guo Jin v. EBI, Inc.*, No. 05 Civ. 4201 (NGG), 2008 WL 896192, at *2 n.3 (E.D.N.Y. Mar. 31, 2008) ("[Plaintiff] may not, however, rely on the unsworn statements in his memorandum of law in order to make a *prima facie* showing of personal jurisdiction."). In recognition of MTS's status as the non-movant on this motion, the Court has nevertheless considered these attached exhibits in resolving Innovative's motion to dismiss.

Compl. ¶ 3 n.2; *see also* 46 U.S.C. §§ 40102(17)(B), (18) (explaining that NVOCC is a "shipper in its relationship with an ocean common carrier," which is the "vessel-operating common carrier").

Innovative is a Texas corporation engaged in recycling and waste management with its principal place of business in Texas. Compl. ¶ 4. The Complaint nowhere alleges that Innovative does business in New York.

### 2. The Shipments

In 2017, MTS began providing its shipping services to Innovative. *Id.* ¶ 5. At that time, MTS forwarded Innovative a credit application form, which Innovative chose not to execute. Salazar Decl. ¶ 9; *see also id.*, Ex. A ("Credit App."). The parties conducted business without that form. *See id.* Ultimately, MTS helped to ship approximately eight overseas shipments of Innovative cargo before the shipment at issue in this suit. Compl. ¶ 5.

In May 2018, Innovative enlisted MTS to ship seven sealed containers of plastic scrap from Houston and Jacksonville to Thailand. *Id.* ¶ 6. MTS secured the Mediterranean Shipping Company (USA) Inc. ("MSC") as the ocean carrier that would transport Innovative's cargo from the United States to Thailand. *See id.* ¶ 9. Beginning in late May 2018, after enlisting MSC as the carrier, MTS issued a series of booking confirmations to Innovative, each of which identified MSC as the "shipping line." *See id.* ¶¶ 9–10; *see also* Salazar Decl., Ex. B ("Booking Confirmation"). MTS tracked Innovative's orders using the following booking confirmation numbers: No. 038VH1158185, *see* Booking Confirmation at 3 (shipment to Laem Chabang, Thailand); No. 038VH1158192, *see id.* at 5 (shipment to Pat Bangkok, Thailand); and No. 038VH1158181, *see id.* at 2 (shipment to Laem Chabang, Thailand). *See* Compl. ¶ 11. On June 9, 2018, after the goods were in transit, MTS issued the first of a series of invoices to Innovative for freight charges related to these shipments. *See* Salazar Decl. ¶ 13; *id.*, Ex. C

("Invoices").  MTS charged Innovative $11,000 for the freight services, which Innovative has not paid.  Compl. ¶ 31.

On or about June 25, 2018, as the MSC ship was on its way to Thailand, the Thai port authority issued a written notice of "suspension of discharging plastics . . . until further notice." *Id.* ¶ 21.  MTS contacted Innovative about the notice and asked for instructions, including an alternative recipient or destination for the cargo.  *Id.* ¶ 22.  Innovative did not provide an alternative recipient or destination, instead instructing MSC that the cargo should be delivered to its original destination.  *Id.* ¶ 23.  Because of the suspension notice, MSC eventually offloaded the cargo in Singapore.  *See id.* ¶¶ 23–24.  Although Innovative was notified of the cargo's arrival in Singapore, it refused to accept or retrieve the cargo.  *Id.* ¶ 25.  As a result, MSC incurred local import charges and expenses associated with the storage and ultimate destruction of the cargo.  *Id.* ¶¶ 26–27.  MSC assessed claims against MTS for demurrage and detention charges,[2] totaling $27,327.  *See id.* ¶¶ 27, 33–35.

### 3.  The Bills of Lading

Bills of ladings are generally issued by carriers, including NVOCCs like MTS and ocean carriers like MSC.  Bills of lading "record[] that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004).  In short, they are, "essentially, contracts."  *Id.* at 18.

---

[2] Demurrage charges are "[l]iquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time."  *Demurrage*, *Black's Law Dictionary* (11th ed. 2019).

*a.* *MTS House Bill of Lading*

The MTS bill of lading ("MTS House Bill of Lading," "House Bill of Lading," or "House Bill") is publicly available on its website. *See* Compl. ¶ 8 (citing and incorporating *MTS Terms and Conditions*, MTS Logistics, http://www.mts-logistics.com/terms-and-conditions (last visited Feb. 24, 2020) ("MTS HB/L")). Under the MTS House Bill of Lading, MTS is defined as the "Carrier," and Innovative falls within the definition of "Merchant."[3] Compl. ¶ 12; MTS HB/L § 1(b), (f). The Bill instructs that MTS is an NVOCC that will, as an agent of the Merchant, contract with "an actual ocean carrier"—here, MSC—to perform the high-seas leg of the shipment pursuant to House Bill of Lading. Compl. ¶ 14; MTS HB/L § 3(a).

The MTS House Bill of Lading contains a variety of substantive provisions. It provides that the Merchant is liable to MTS for all "undertakings and responsibilities of the Merchant under this Bill of Lading, including the payment of all Charges due[.]" Compl. ¶ 15; MTS HB/L § 3(d). Further, it states that the Merchant is a third-party beneficiary to the "ocean-carrier's bill of lading"—*i.e.*, the MSC bill of lading discussed below—and is bound by the terms of that bill. Compl. ¶ 16; MTS HB/L §§ 3(b), 5(e). The MTS House Bill also provides that MTS will comply with notices, orders, and directives of governments and port authorities, that such compliance is not an "unreasonable deviation" from the bill of lading, and that the Merchant is liable for any costs or expenses arising from such an event. Compl. ¶¶ 17–18; MTS HB/L § 14(b), (d).

Relevant here, the MTS House Bill of Lading also contains a forum selection clause, stating that any dispute between MTS and the Merchant arising under the House Bill "shall be

---

[3] The MTS House Bill of Lading defines "Merchant" as "shipper of the Goods, the consignor, the consignee or receiver of the Goods, the holder of this Bill of Lading, the owner of the Goods or person claiming or entitled to possession of the Goods." MTS HB/L § 1(f).

venued exclusively in the United States District Court for the Southern District of New York or the New York State Supreme Court, County of New York." *See* Compl. ¶ 20; MTS HB/L § 21(a). That same provision further states that the Merchant waives any objection to venue and personal jurisdiction. MTS HB/L § 21(a). Last, it provides that the prevailing party in any dispute is entitled to reimbursement of its attorneys' fees and costs from the losing party. Compl. ¶ 20; MTS HB/L § 21(c).

Innovative claims—and MTS does not appear to dispute—that MTS never communicated the terms of its House Bill of Lading to Innovative prior to this suit.[4] Salazar Decl. ¶ 14. In addition, neither the booking confirmation nor the invoices issued by MTS to Innovative reference the MTS House Bill. *Id.* ¶¶ 10, 13; *see also* Booking Confirmation; Invoices. The unexecuted credit application form, while not referencing the MTS House Bill of Lading, does state that a customer who seeks such credit agrees to various terms—including that disputes under that agreement will be brought "in a court of competent jurisdiction in the State of New York, County of New York"—"[i]n consideration for the extension of credit through the issuance and release of Bills of lading by MTS Logistics, Inc." Credit App. at 1.

---

[4] MTS, instead, argues that its lack of delivery of its House Bill of Lading to Innovative does not prevent Innovative from being bound by its terms. *See* Pl. Mem. at 18–20. The Court addresses this argument below.

MSC issued its bill of lading ("MSC Master Bill of Lading," "MSC Master Bill," or "Master Bill") to MTS.[5]  *See* Compl. ¶¶ 7, 11, 28.  Under the Master Bill, MTS was liable to MSC for any detention or demurrage charges incurred when transporting Innovative's cargo.  *See id.* ¶ 28.  The terms and conditions listed on MSC's website include a forum selection clause, designating the Southern District of New York as the exclusive forum for disputes.  *See* Dkt. 18 ("Pl. Mem.") at 13 (citing *MSC United States Terms and Conditions*, Mediterranean Shipping Company (USA) Inc., https://www.msc.com/usa/contract-of-carriage/agency-terms-conditions (last visited Feb. 24, 2020) ("MSC MB/L")).[6]  Innovative claims that the terms of the MSC

---

[5] The Complaint and the parties' respective memoranda of law reference several different documents with respect to MSC.  These include the Master Bill of Lading from MSC, *see, e.g.*, Compl. ¶ 7; Dkt. 18 ("Def. Mem.") at 3; an Ocean Bill of Lading from MSC, *see, e.g.*, Pl. Mem. at 3; and a Sea Waybill from MSC, *see* Compl. ¶ 11; Pl. Mem. at 3 n.2.  The Court understands these references all to refer to the same document.  MTS explains that, here, MSC's Ocean Bill of Lading was actually a Sea Waybill.  *See* Pl. Mem. at 3 n.2.  However, the difference between the two—that a bill of lading is negotiable while a sea waybill is not—is not relevant to the resolution of this case.  *See id.*; *see also* Compl. ¶ 11 n.3.  In addition, MTS cites an Internet source that explains that master bills of lading are issued by the actual shipping line to the NVOCC, whereas house bills of lading are issued by the NVOCC to its customers.  *See* Pl. Mem. at 8 (citing Hariesh Manaadiar, *Difference Between House Bill of Lading and Master Bill of Lading*, Shipping and Freight Resource (Sept. 1, 2011), https://shippingandfreightresource.com/difference-between-house-bill-of-lading-and-master-bill-of-lading/); *see also* Def. Mem. at 3 (explaining that master bill of lading is issued by the actual carrier, here MSC, to MTS).  The Court will refer to this document as the MSC Master Bill of Lading.

[6] MTS refers to the MSC Master Bill of Lading in its Complaint, *see* Compl. ¶¶ 7, 11, but that document is not incorporated in or attached to the Complaint, nor is it integral to the Complaint, as MTS's claims are all based on the MTS House Bill of Lading, *see id.* ¶¶ 31, 33–36, 38.  *See Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (court can consider, on a motion to dismiss, "any written instrument attached to [the complaint] as an exhibit or documents incorporated in it by reference," and any documents on which the plaintiff "solely relies and which [are] integral to the complaint" (citation omitted)).  MTS also does not attach the MSC Master Bill of Lading to a sworn affidavit, but simply cites the hyperlink to the Master Bill in its memorandum.  *See* Pl. Mem. at 13.  Despite the lack of authentication, the Court still takes into account the terms of the MSC Master Bill of Lading.

Master Bill of Lading were not provided to it until after the cargo was shipped. Salazar Decl. ¶ 10. MTS disputes this, and the Court draws the inference, in MTS's favor, that MTS sent the Master Bill of Lading to Innovative before the shipment commenced.[7] *See* Pl. Mem. at 13.

### B.    This Action

On May 9, 2019, MTS filed its Complaint, commencing this action under the terms of its House Bill of Lading for payment for freight charges, reimbursement for demurrage and detention charges it received from MSC, and attorneys' fees from Innovative. Compl. ¶¶ 30–39. On June 19, 2019, Innovative filed its answer. Dkt. 11. On June 20, 2019, the Court scheduled an initial pretrial conference for July 22, 2019. Dkt. 12. On July 22, 2019, the Court held that conference, stayed discovery, and issued a briefing schedule for Innovative's anticipated motion to dismiss for lack of personal jurisdiction. Dkt. 15.

On August 2, 2019, Innovative filed its motion to dismiss, Dkt. 16, accompanied by a memorandum of law in support of the motion, Def. Mem., and the Salazar Declaration and attached exhibits, Salazar Decl. On August 16, 2019, MTS filed its memorandum in opposition to the motion and attached exhibits. Pl. Mem. On August 22, 2019, Innovative filed its reply memorandum. Dkt. 2.

---

[7] MTS argues that it is "industry standard practice" for MTS to forward the ocean carrier's bill of lading to Innovative, "[s]o INNOVATIVE is quite wrong in saying the Ocean B/L was 'not seen' 'until after the transit commence[d].'" Pl. Mem. at 13. MTS also points to a January 2018 email from Innovative related to an earlier shipment, in which Innovative suggested changes to an ocean carrier's bill of lading, *see* Pl. Mem., Ex. 5, and shipping instructions from Innovative related to this shipment, in which Innovative wrote "ADD INNOVATIVE COMMODITIES, LLC GROUP AS THE SHIPPER ON THE MBL," *see id.*, Ex. 2 ("Shipping Instructions"). MTS, interestingly, does not assert that MTS did in fact send the MSC Master Bill of Lading to Innovative for review before transit. The Court nevertheless will draw that inference in MTS's favor on this motion insofar as MTS is the non-movant.

## II. Applicable Legal Standards

### A. Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano*, 286 F.3d at 84; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

"Where, as here, a district court in adjudicating a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) 'relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction.'" *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)). "This showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *Id.* (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).

The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester Fin. Secs.*, 722 F.3d at 85 (quoting *S. New Eng. Tel.*, 624 F.3d at 138); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993). Nevertheless, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

In determining whether there is personal jurisdiction, the Court applies a two-part test. First, the Court must decide whether the personal jurisdiction over MTS's claims is supplied by a forum selection clause. If so, the analysis ends there. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements"); *Exp.-Imp. Bank of the U.S. v. Hi-Films S.A. de C.V.*, No. 09 Civ. 3573 (PGG), 2010 WL 3743826, at *4 (S.D.N.Y. Sept. 24, 2010) ("Where an agreement contains a valid and enforceable forum selection clause, however, it is not necessary to analyze jurisdiction under New York's long-arm statute or federal requirements of due process."); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997) ("It is well-settled that jurisdiction by consent satisfies constitutional principles of due process." (citation omitted)), *aff'd sub. nom. Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998).

Second, to the extent that the forum selection clause does not supply personal jurisdiction over a particular claim or claims, the Court inquires whether there is personal jurisdiction over Innovative under principles of New York law, based either on general jurisdiction, *see* New York Civil Practice Law and Rules ("CPLR") § 301, or specific jurisdiction, *see* CPLR § 302. If jurisdiction is found on either ground, the Court then inquires whether "an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005); *see generally Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

## III.    Discussion

Consistent with that two-step approach, the Court first addresses the potentially applicable forum selection clauses, and then addresses the other bases of personal jurisdiction.

## A.     Forum Selection Clauses

In an admiralty case such as this, federal law governs the applicability of a forum selection clause. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 590 (1991). "In the admiralty context, forum selection clauses 'are prima facie valid.'" *Am Int'l Grp. Eur. S.A. (It.) v. Franco Vago Int'l, Inc.*, 756 F. Supp. 2d 369, 376 (S.D.N.Y. 2010) ("*Franco Vago*") (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) ("*Bremen*")). In the Second Circuit, a party seeking to enforce a forum selection clause must demonstrate that: "(1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause." *Tropp v. Corp. of Lloyd's*, 385 F. App'x 36, 37 (2d Cir. 2010); *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007). If all three of these requirements are met, the forum selection clause is presumed enforceable, unless the party opposing enforcement can rebut the presumption by "making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Phillips*, 494 F.3d at 383–84 (quoting *Bremen*, 407 U.S. at 15).

MTS invokes the forum selection clauses from both the MTS House Bill of Lading and the MSC Master Bill of Lading as sources of personal jurisdiction.[8] The Court examines these in turn.

---

[8] MTS also argues that Innovative is bound by the forum selection clause in the credit application form that Innovative never executed or signed, because Innovative requested the shipment to Thailand without, at the same time, paying the freight charges, thus triggering the credit agreement. Pl. Mem. at 10–11. Even though this forum selection clause was communicated to Innovative, it is not applicable here because Innovative never submitted the credit application form or consented to the forum selection clause in it.

### 1.     MTS House Bill of Lading

Innovative argues that the forum selection clause in the MTS House Bill of Lading is not enforceable because the clause was not reasonably communicated to Innovative.  Def. Mem. at 6–7; *see also* Salazar Decl. ¶ 12.  The Court agrees.

It is undisputed that MTS did not provide Innovative with the MTS House Bill of Lading. Innovative states that MTS did not provide a copy of its House Bill of Lading in the eight prior transactions or in the transaction at issue here and, in fact, did not communicate the terms and conditions of that bill of lading to Innovative until this lawsuit.  Salazar Decl. ¶¶ 10–14.  MTS does not contend otherwise, but instead argues "that MTS may not have issued/delivered its House B/L to INNOVATIVE does not preclude application of that instrument to the carriage." Pl. Mem. at 4.

MTS's argument falls flat.  The Second Circuit has held, in the context of sea carriers imposing limitations on their passengers' rights to sue, that the test for what constitutes reasonable communication is whether the carrier "had done *all it reasonably could* to warn the passenger that the terms and conditions were important matters of contract affecting his legal rights."  *Silvestri v. Italia Societa Per Azioni Di Navigazione*, 388 F.2d 11, 17 (2d Cir. 1968) (emphasis added); *see also Ward v. Cross Sound Ferry*, 273 F.3d 520, 523 (2d Cir. 2001); *Spataro v. Kloster Cruise, Ltd.*, 894 F.2d 44, 45–46 & n.1 (2d Cir. 1990) (per curiam) (collecting cases in other circuits, and district courts within this Circuit, holding that "all it reasonably could" constitutes the standard for reasonable communication).  MTS's failure to provide Innovative, over the course of nine transactions, with a copy of its House Bill of Lading falls far short of all MTS reasonably could have done.  *See FSB USA, Inc. v. Am. Prods. Prod. Co. of Pinellas Cty.*, No. 08 Civ. 1758 (JCH), 2009 WL 2762744, at *4–5 (D. Conn. Aug. 24, 2009) (rejecting argument that standard was satisfied because plaintiff "only had to ask [defendant] to

send the terms" and explaining that "simply sending one copy of the Terms to [plaintiff], which this court has reasonably concluded that [defendant] failed to do, would have ensured that the terms were reasonably communicated"); *cf. Starkey v. G Adventures Inc.*, 796 F.3d 193, 197 (2d Cir. 2015) (reasonable communication where defendant had sent three emails to plaintiff, instructing him that he had to agree to terms and conditions and providing hyperlink to bolded "TERMS AND CONDITIONS"); *Rescuecom Corp. v. Chumley*, 522 F. Supp. 2d 429, 445 (N.D.N.Y. 2007) (reasonable communication where plaintiff had twice sent defendant the agreement). This failure to communicate the House Bill's terms to Innovative meant that Innovative was not aware that one of those terms was a forum selection clause. *See* Salazar Decl. ¶ 14; *Anwar v. Fairfield Greenwich Ltd.*, 742 F. Supp. 2d 367, 374 (S.D.N.Y. 2010) ("If the [plaintiffs] never received the [terms and conditions] it is fair to say that the [terms and conditions] were not 'reasonably communicated' to them and therefore the first factor of *Phillips* would not be satisfied."); *cf. Atl. Container Line AB v. Volvo Car Corp.*, No. 14 Civ. 1811 (CM), 2014 WL 4730152, at *6 (S.D.N.Y. Sept. 22, 2014) (noting that defendant "does not make the argument that it never received the Standard Terms" when holding that forum selection clause was reasonably communicated to it).

The circumstances here deviate far from scenarios in which reasonable communication is commonly found. This is not, for example, a case where the party contesting the forum selection clause had signed the agreement containing such a clause. *See, e.g., Horvath v. Banco Comercial Portugues, S.A.*, 461 F. App'x 61, 62–63 (2d Cir. 2012); *Giordano v. UBS, AG*, 134 F. Supp. 3d 697, 705–06 (S.D.N.Y. 2015). Nor is it a case where that party had examined the agreement, *see, e.g., Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 256 (E.D.N.Y. 2013), or had a hand in including the forum selection clause in such agreement, *see, e.g., SLSJ, LLC v.*

*Kleban*, No. 14 Civ. 390 (CSH), 2015 WL 1973307, at *14 n.18 (D. Conn. Apr. 30, 2015);

*Fubon Ins. Co. v. OHL Int'l*, No. 12 Civ. 5035 (RJS), 2014 WL 1383604, at *6 (S.D.N.Y.

Mar. 31, 2014). Finally, it does not involve any document that incorporates, or even references,

the terms of the MTS House Bill of Lading—for none of the booking confirmations, invoices, or

credit application form do so, *see* Salazar Decl. ¶¶ 9–10, 13. *See, e.g.*, *A.P. Moller-Maersk A/S*

*v. Comercializadora de Calidad S.A.*, 429 F. App'x 25, 28 (2d Cir. 2011); *Salis v. Am. Exp.*

*Lines*, 331 F. App'x 811, 813–14 (2d Cir. 2009).

MTS attempts, through two main arguments, to salvage the forum selection clause

despite its failure to deliver its House Bill of Lading to Innovative. *See* Pl. Mem. at 17–20.

First, it argues that Innovative was aware of MTS's House Bill of Lading. Second, it contends

that MTS's House Bill of Lading still governs, even if unissued and undelivered. These

arguments are unpersuasive.

First, MTS argues that Innovative was aware of the MTS House Bill of Lading,

regardless whether MTS had delivered or communicated its terms to Innovative. *See* Pl. Mem.

at 17–18. MTS points to two main pieces of evidence in support of its argument: (1) the prior

dealings between the parties, including an email from MTS to Innovative in May 2016; and

(2) Innovative's request, in connection with this shipment, to be added "as the shipper on the

MBL" on shipping instructions that it had sent to MTS. The Court examines each in turn, after

first noting that it construes MTS's argument as one of constructive notice: The forum selection

clause, MTS contends, was reasonably communicated to Innovative because Innovative had been

aware of the MTS House Bill of Lading, could access it on the MTS's website, and is—as a

party entering into an agreement with MTS—charged with knowing and understanding the

contents of such an agreement. Therefore, MTS argues, even if Innovative did not have actual

knowledge of the forum selection clause, it cannot claim that such a clause was not reasonably communicated to it. *See Horvath*, 461 F. App'x at 63 (rejecting lack of reasonable communication argument because "parties are charged with knowing and understanding the contents of documents they knowingly sign," including forum selection clauses).

As to the general prior dealings between MTS and Innovative, MTS is correct that "[e]vidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms." *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997). However, where courts have found prior dealings relevant to the issue of reasonable communication of a forum selection clause, they have noted that the party against whom the clause was being enforced was aware of the terms of the contract or had seen the contract on numerous prior occasions.[9] *See, e.g.*, *Salis*, 331 F. App'x at 813 (reasonable communication where plaintiff "had engaged in repeated transactions with defendants" and "was aware of the terms and conditions contained in [defendants'] standardized bills of lading").[10] It is not enough simply to have had some prior dealings. *Cf. Encyclopaedia Britannica, Inc. v. S.S.*

---

[9] The cases on which MTS relies either do not support its conclusion, *see New Moon Shipping*, 121 F.3d at 31–32 (explaining that course of dealings analysis requires "an indication of the common knowledge and understanding of the parties" that can be "inferred from resolution of a prior dispute . . . or from tacit acceptance of a clause repeatedly sent to the offeree in an order confirmation document" and finding that prior dealings did not show plaintiffs' consent to forum selection clause because form from prior dealings lacked forum selection clause), or do not fit the scenario presented here, *see OOCL (USA) Inc. v. Transco Shipping Corp.*, No. 13 Civ. 5418 (RJS), 2015 WL 9460565, at *4 (S.D.N.Y. Dec. 23, 2015) (defendant had previously signed, and returned to plaintiff, 90 bills of lading with the same terms and conditions as bill at issue); *Maersk Inc. v. Am. Midwest Commodities Exp. Cos.*, No. 97 Civ. 475 (NRB), 1998 WL 473945, at *3 (S.D.N.Y. Aug. 10, 1998) (defendant used plaintiff as carrier for two years, and plaintiff had provided defendant "with full opportunity to review the [bill of lading] and become familiar with its terms").

[10] The district court decision in *Salis* indicated that Salis's counsel, at a conference before that court, had attested to these facts. *Salis v. Am. Exp. Lines*, 566 F. Supp. 2d 216, 221–22 (S.D.N.Y. 2008), *aff'd in part, vacated in part*, 331 F. App'x 811 (2d Cir. 2009).

*H.K. Producer*, 422 F.2d 7, 17 (2d Cir. 1969) (rejecting district court's finding that plaintiff

"was, from experience, familiar with [defendant's] bill of lading" and that its agent "was, or

should have been, because it dealt with [defendant], infers too much"); *CMA CGM (Am.) LLC v.*

*Seafood Expert W. Inc.*, No. 13 Civ. 2839 (VSB), 2015 WL 1564996, at *8

(S.D.N.Y. Mar. 31, 2015) (rejecting argument that prior two dealings could establish a course of

conduct between parties to a bill of lading, because such dealings did not constitute a

"well-established custom" repeated in "numerous purchases over a period of time" (citation

omitted)). Here, MTS relies on the general fact of the prior dealings, but does not take the extra

step of showing that Innovative was aware of the terms and conditions in its House Bill of

Lading or had seen those terms at any point, let alone on numerous occasions.

MTS notes the May 2016 email, but that email does not make such a showing. This

email, dated May 23, 2016, is one of the first sent from MTS to Innovative. *See* Pl. Mem., Ex. 3

("May 23, 2016 Email"). In this email, the MTS representative says that he is attaching a short

summary about MTS, which highlights its credit rating, chemical experience, and geographic

regions of expertise. *Id.* at 1. He then states, "[f]or more details you can visit our website and

blog on my signature." *Id.* After setting out the shipping rate pricing for 22 ports around the

world, he says that such rates are only subject to certain charges—"Doc. $50 per bill of lading"

and "AES. $45 per bill of lading"—and that the rates are valid through "end of June." *Id.* at 1–2.

MTS argues that the reference to certain "per bill of lading" charges and its website shows that,

from the beginning, Innovative knew it would be contracting on MTS's House Bill of Lading

and that this bill of lading was posted on its website. Pl. Mem. at 7.

These email references are not sufficient to show Innovative's awareness of the MTS

House Bill of Lading. First, the reference to charges occurring "per bill of lading" is not

specific—it does not make clear which bill of lading it is referencing. The MTS representative

does not state that MTS has a standard "House Bill of Lading." Nor does the MTS

representative point Innovative to the MTS House Bill of Lading through a hyperlink or

attachment of such bill.[11] Second, MTS's contention that Innovative would have been aware that

the MTS House Bill of Lading was on its website is simply not reflected from the email: The

MTS representative says, after describing attributes of the company, that Innovative can "visit

our website" "[f]or more details." May 23, 2016 Email at 1. He, notably, does not say to visit

the MTS website in order to access the terms of the MTS House Bill of Lading. That such terms

can be found on the website alone does not constitute reasonable communication on MTS's part.

*See Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 368 (E.D.N.Y. 2009) (no constructive

notice where defendant utilized a browse-wrap agreement and failed "to cite a single case that

suggests that merely posting such terms on a different part of a website constitutes reasonable

communication of a forum selection clause"), *aff'd*, 380 F. App'x 22 (2d Cir. 2010); *Motise v.*

---

[11] Even if MTS had taken such steps, it is not clear that they would constitute reasonable communication. That analysis would depend on the context of what was said in the email and how the email appeared. *Cf. Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (analysis of notice of terms on websites "depends heavily" on "the design and content" of the webpage). *Compare Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293–94 (2d Cir. 2019) (finding no notice, in arbitration context, where hyperlink of terms and conditions at bottom of email confirming purchase did not advise customer to click on link or that the link was where his contract could be found), *and Nicosia*, 834 F.3d at 236–37 (finding no notice, in arbitration context, of terms where hyperlink to terms and conditions appeared at top and bottom of Amazon purchase page, but message that customer was agreeing to conditions was not bolded, capitalized, or conspicuous and there were other links in different colors, fonts, and locations on that same page), *with Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77–79 (2d Cir. 2017) (finding reasonable communication, in arbitration context under California law, where customer is instructed that by "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"—hyperlinked in blue and underlined—and entire screen was visible at once and appeared at time of enrollment), *and Starkey*, 796 F.3d at 197 (finding reasonable communication where two emails contained instruction to access terms and conditions by clicking on hyperlink and third email introduced the hyperlink as the "following terms and conditions" and "underlin[ed] the URL in a manner distinctive to hyperlinks").

*Am. Online, Inc.*, 346 F. Supp. 2d 563, 564–65 & n.1 (S.D.N.Y. 2004) (no constructive notice where terms available on different part of website). More is needed, beyond the online public posting of the MTS House Bill of Lading for the Court to find that MTS reasonably communicated the terms to Innovative. *See, e.g.*, *A.P. Moller-Maersk A/S*, 429 F. App'x at 28–29 (reasonable communication where defendant had insisted on $10 million cash security to avoid arrest of plaintiff's vessels unless plaintiff agreed to waive forum selection clause, standard bill of lading was available online and was incorporated into the booking confirmation by reference, and defendant had sued on billing confirmation in other jurisdictions).

MTS's second piece of evidence—Innovative's request to be added "as the shipper on the MBL" on the shipping instructions that it had sent to MTS, *see* Shipping Instructions—fares no better. MTS argues that this request demonstrates that Innovative knew of the MSC Master Bill of Lading, and therefore is chargeable with knowledge of the MTS House Bill—and its forum selection clause—because in industry practice, an "'MBL' feeds from and implies a predicate House B/L." Pl. Mem. at 18; *see also id.* at 7–8. MTS does not cite any case law to support its assertion that industry practice alone satisfies its duty to reasonably communicate the forum selection clause in its House Bill of Lading. And it cites only a blog post to show that house bills of lading are generally issued by NVOCCs alongside master bills of lading. *See id.* at 8 (citing Manaadiar, *supra* note 5). MTS's assertion that Innovative should have been on notice that there could have been another contract out there, in the form of the House Bill of Lading, which could have had a forum selection clause, pushes the concept of constructive notice past its breaking point. That is especially true in that, as even a cursory review of the case law reveals, master bills of lading and house bills of lading can have differing terms, including different forum selection clauses. *See, e.g.*, *Franco Vago*, 756 F. Supp. 2d at 371–72 (purported NVOCC's bill

of lading contained forum selection clause for Italy, while ocean carrier's bill of lading contained forum selection clause for England).  However, even if industry practice could suffice for reasonable communication of a forum selection clause, that practice would not be enough here.  That is because MTS's practice with Innovative has not been to follow the purported industry practice and issue a house bill of lading to correspond with the ocean carrier's master bill of lading, but—over the course of eight prior shipments, as discussed above—not to issue any house bill of lading.  Therefore, MTS and Innovative's prior dealings prevent an inference that Innovative's awareness of the MSC Master Bill of Lading meant that Innovative was on constructive notice of terms of a never previously issued or seen MTS House Bill of Lading.

MTS's second argument is that MTS did not have an obligation to identify the terms of its House Bill of Lading or deliver that bill to Innovative because the owner of goods can be bound by the terms of a bill of lading even where such a bill of lading is unissued.  Pl. Mem. at 18–19.  Although unissued bills of lading can, in certain circumstances, govern a particular shipment, such is not the case here.  In the case MTS cites to support its argument, *OOO Garant-S v. Empire United Lines Co.*, No. 11 Civ. 1324 (FB), 2013 WL 1338822 (E.D.N.Y. Mar. 29, 2013), *aff'd sub nom. OOO v. Empire United Lines Co.*, 557 F. App'x 40 (2d Cir. 2014), the court explained that "where a shipper has knowledge as to the contents of a carrier's standard bill of lading, the parties may be bound by its terms even where a bill of lading has not been issued for the particular goods in question."  *Id.* at *3.  It held that the parties were bound by the terms of the carrier's standard bill of lading, even though the carrier had yet to issue the bill of lading particular to that shipment, because the plaintiff had shipped "hundreds of automobiles a year with the assistance of [the carrier] since 2008," and there was no dispute that the carrier had issued, and the plaintiff had received, many standard bills of lading containing the

clause at issue.[12]  *Id.* at *3–4; *see also Anvil Knitwear, Inc. v. Crowley Am. Transp., Inc.*,

No. 00 Civ. 3243 (NRB), 2001 WL 856607, at *2 (S.D.N.Y. July 27, 2001) (bill of lading issued

after shipment applied to shipment because parties "had utilized an identical bill of lading on

'hundreds' of previous occasions").  The case here is not the same.  MTS does not present any

evidence that Innovative had knowledge of the contents of the standard MTS House Bill of

Lading or that MTS had, in any prior dealings between the parties, provided that House Bill to

Innovative—and Innovative contends that it had never received the House Bill and was not

aware of its terms, Salazar Decl. ¶ 14.  Given the lack of awareness of the standard House Bill of

Lading, MTS's unissued bill of lading cannot be held to control.

Accordingly, the MTS House Bill of Lading's forum selection clause was not reasonably

communicated to Innovative and cannot serve as the basis for personal jurisdiction.

### 2.    MSC Master Bill of Lading

MTS also argues that the forum selection clause in the MSC Master Bill of Lading

provides a basis for this Court to exercise personal jurisdiction over Innovative.  *See* Pl. Mem.

at 13–15.  It contends that MTS is identified on the MSC Master Bill of Lading as the cargo

shipper "ON BEHALF OF INNOVATIVE COMMODITIES GROUP, LLC," and, as a result,

Innovative is either a party or at least a third-party beneficiary to the Master Bill and thus the

---

[12] MTS also cites an out-of-circuit case, *Diamond Rigging Co. v. BDP Int'l, Inc.*,
320 F. Supp. 3d 947, 953 (N.D. Ohio 2018), *aff'd*, 914 F.3d 435 (6th Cir. 2019).  There, the
Northern District of Ohio, stating that a "carrier's standard bill of lading will govern when the
parties, through prior course of dealing or practice, reasonably expected that the carriage would
be subject to the carrier's bill," held that the bill of lading at issue applied because the plaintiff
had notice of the terms when it signed a booking note that contained a copy of the bill of lading
terms before such bill was issued.  *Id.* (citation omitted).  Again, the same is not true here—the
booking confirmation that MTS received did not contain, or even reference, the terms of the
MTS House Bill of Lading.  Salazar Decl. ¶ 10.

Master Bill's forum selection clause can be enforced against it. *See id.* at 14–15. The Court holds, however, that MTS cannot invoke the MSC Master Bill of Lading in its suit.

MTS cannot invoke the Master Bill of Lading that it negotiated with MSC as the basis for jurisdiction in a suit between MTS and Innovative because it fails the third prong of the *Phillips* test: It does not govern the claims and parties here. "The liability of each [party] must be determined by reference to its own bill of lading . . . consistent with the weight of authority, including caselaw from this circuit." *Franco Vago*, 756 F. Supp. 2d at 377 (brackets omitted) (citing *Royal Ins. Co. v. M.V. ACX RUBY*, No. 97 Civ. 3710 (MBM), 1998 WL 524899, at *2 (S.D.N.Y. Aug. 21, 1998) (collecting cases)). In *Franco Vago*, the court addressed a situation analogous to this case. There, an NVOCC—or freight forwarder (its exact role was disputed)—was attempting to invoke a forum selection clause in the ocean carrier's bill of lading, which called for all suits to be brought in England, as a basis for dismissing a suit by the cargo owner that was brought in this District. *See id.* at 372, 377. The NVOCC did not invoke the forum selection clause in its own bill of lading that it issued to the cargo owner, which mandated that all suits under that bill be brought in Italy. *See id.* at 371, 374–75. The court declined to dismiss the suit on the basis of the ocean carrier's forum selection clause, explaining that "an upstream intermediary," *i.e.*, an NVOCC, "cannot co-opt the terms of a downstream carrier's bills of lading, but instead must rely on the terms of its own bills of lading." *Id.* at 377. Here, MTS is proposing to do just that—to co-opt the forum selection clause in MSC's Master Bill of Lading, because it failed to reasonably communicate the forum selection clause in its own House Bill of Lading. It cannot do so.

MTS points to case law suggesting that, at times, forum selection clauses can be enforced against closely related parties, including against a party who is a non-signatory to the agreement.

*See* Pl. Mem. at 14; *see also Overseas Ventures, LLC v. ROW Mgmt., Ltd.*, No. 12 1033 (PAE), 2012 WL 5363782, at *5 (S.D.N.Y. Oct. 26, 2012) (collecting cases). That is true in scenarios in which an NVOCC, acting as an agent for the cargo owner, binds the cargo owner to a limitation of liability in an agreement with a downstream carrier. *See Kirby*, 543 U.S. at 33–35. Although the Supreme Court has not explicitly addressed whether a forum selection clause qualifies as a "limitation of liability," courts in this Circuit have consistently held that intermediaries, including NVOCCs, can commit cargo owners to a forum selection clause in a downstream carrier's bill of lading. *See, e.g.*, *A.P. Moller-Maersk A/S v. Ocean Express Miami*, 550 F. Supp. 2d 454, 462–66 (S.D.N.Y. 2008) (collecting cases); *Glyphics Media, Inc. v. M.V. Conti Singapore*, No. 02 Civ. 4398 (NRB), 2003 WL 1484145, at *7 (S.D.N.Y. Mar. 21, 2003) ("[I]n accordance with general maritime practice, an NVOCC binds the shipper to the VOCC's bill of lading."); *Jockey Int'l, Inc. v. M/V Leverkusen Express*, 217 F. Supp. 2d 447, 456–57 (S.D.N.Y. 2002). Hence, when the downstream carrier sues the cargo owner on the basis of a bill of lading that the carrier entered into with the NVOCC, the cargo owner has limited bases for objection. *See Franco Vago*, 756 F. Supp. 2d at 377 ("[M]ore difficult questions can arise when determining whether the terms in a shipper and freight forwarder's contract can be asserted by *downstream* intermediaries or carriers[.]" (emphasis in original) (citing *Kirby*, 543 U.S. at 14)). But this case presents a different scenario entirely: Instead of an ocean carrier suing a cargo owner on its own bill of lading, MTS, an NVOCC, is attempting to invoke the ocean carrier's bill

of lading to bolster MTS's claim.  It cannot do that.[13]  *Cf. Affiliated FM Ins. Co. v. Kuehne +*

*Nagel, Inc.*, 328 F. Supp. 3d 329, 337 (S.D.N.Y. 2018) (declining to extend "closely related"

scenario where party to sea waybill attempted to enforce forum selection clause against its

subcontractor, who was not a party to that agreement, and explaining that the party and

subcontractor "had the opportunity to negotiate and agree to a forum selection clause, but, for

whatever reason, they declined to do so.").

As a result, the forum selection clause in the MSC Master Bill of Lading does not provide

a basis for personal jurisdiction over Innovative.

### B.     General and Specific Jurisdiction

Because the forum selection clauses do not supply personal jurisdiction, the next question

is whether there is general or specific jurisdiction.  "General jurisdiction renders a defendant

amenable to suit on all claims, while specific jurisdiction renders a defendant amenable to suit

only on those claims that arise from conduct related to the forum."  *Id.* at 339 (internal quotation

marks, citation, and brackets omitted).  MTS does not argue that either applies here.

#### 1.     General Jurisdiction

In New York, general jurisdiction is exercised pursuant to CPLR § 301.  *See State Farm*

*Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 887 (S.D.N.Y. 2017).  Under CPLR

§ 301, jurisdiction is proper when "a company 'has engaged in such a continuous and systematic

---

[13] The Court recognizes that a court in this District has allowed an upstream intermediary to
invoke the forum selection clause from a downstream ocean carrier's bill of lading in a suit
between the intermediary and the cargo owner.  *See Mahmoud Shaban & Sons Co. v.*
*Mediterranean Shipping Co., S.A.*, No. 11 Civ. 6322 (TPG), 2013 WL 316151, at *4
(S.D.N.Y. Jan. 28, 2013).  The court there, without acknowledging conflicting case law,
reasoned that both the cargo owner and the intermediary fell within the bill of lading's definition
of "Merchant" and that the forum selection clause applied in a suit between the intermediary and
the cargo owner because the bill of lading covered "any suit by Merchant."  *See id.*  The court
does not find that analysis persuasive and declines to adopt it here.

course of "doing business" [in New York] that a finding of its "presence" [in New York] is warranted.'" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (citations omitted) (alterations in original) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs.*, 77 N.Y.2d 28, 33 (1990)); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000).

The Due Process Clause, however, is more restrictive. A court may exercise general jurisdiction over foreign corporations only "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "[E]xcept in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' [and, thus, amenable to general personal jurisdiction] only where it is incorporated or maintains its principal place of business— the 'paradigm' cases." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (analyzing impact of *Daimler AG v. Bauman*, 571 U.S. 117 (2014)).

Innovative is not subject to general jurisdiction in New York. It is a Texas corporation with its principal place of business in Texas. Salazar Decl. ¶ 3. It does not regularly conduct business in New York, nor does it have any offices, permanent employees, or bank accounts in the state. *See id.* ¶¶ 4–7. And this is not an exceptional case allowing for general jurisdiction.

### 2.     Specific Jurisdiction

In New York, specific jurisdiction is exercised pursuant to CPLR § 302. *See State Farm Fire & Cas.*, 246 F. Supp. 3d at 887. Specific jurisdiction exists when a cause of action arises out of a defendant (1) transacting business in New York, (2) committing a tortious act in New York, (3) committing a tortious act outside of New York that causes injury within New York, or (4) owning, using, or possessing real property in New York. *See* CPLR § 302(a)(1)–(4). Only (1) and (3) merit discussion here.

24

First, to establish specific jurisdiction under § 302(a)(1), MTS must show that (1) Innovative transacted business in New York, and (2) the claim asserted arises from that business activity. *See Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007). "New York courts define transacting business as purposeful activity—some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation marks, citations, and brackets omitted).

MTS has not alleged that Innovative in any way purposefully availed itself of the laws of New York. That Innovative entered into a contract with MTS, a New York corporation, is not purposeful availment. *Sandoval v. Abaco Club on Winding Bay*, 507 F. Supp. 2d 312, 316 (S.D.N.Y. 2007) ("Multiple district courts in this Circuit have held . . . that 'the mere existence of a contract with a New York corporation is not sufficient to constitute the transaction of business under § 302(a)(1) of the CPLR." (citation omitted)) (collecting cases).

Second, the acts alleged here—committed outside New York and alleged to have caused injury to a New York corporation—do not constitute tortious acts under § 302(a)(3). MTS has essentially brought breach of contract claims based on Innovative's alleged failure to comply with the terms of the MTS House Bill of Lading. *See* Compl. ¶¶ 30–39. But "New York courts routinely hold that a breach of contract claim does not constitute a tortious act and may not form the basis of long-arm jurisdiction pursuant to section 302(a)(3)." *Affiliated FM Ins. Co.*, 328 F. Supp. 3d at 340 (quoting *Jonas*, 116 F. Supp. 3d at 332 (collecting cases)).

As a result, MTS has failed to allege specific jurisdiction under any part of the New York long-arm statue. Because the Court does not have personal jurisdiction over Innovative based on

a forum selection clause, general jurisdiction, or specific jurisdiction, the Court dismisses MTS's Complaint, without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Innovative's motion to dismiss and dismisses MTS's Complaint for lack of personal jurisdiction. This dismissal is without prejudice to MTS's ability to file suit in a court of competent jurisdiction. The Clerk of Court is respectfully directed to terminate the motion pending at docket 16 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 26, 2020
      New York, New York